

# ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

December 6, 2004

The Honorable James L. Keffer
Chair, Committee on Economic Development
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. GA-0276

Re: Whether a home-rule city may extend a Tax Code, chapter 311 reinvestment zone's termination date beyond the date provided in the ordinance designating the zone (RQ-0238-GA)

Dear Representative Keffer:

You ask whether a home-rule city may extend a Tax Code, chapter 311 reinvestment zone's termination date beyond the date provided in the ordinance designating the zone.[1]

## I.     Factual and Legal Background

Your question involves a reinvestment zone authorized by chapter 311 of the Tax Code, the Tax Increment Financing Act, *see* TEX. TAX CODE ANN. § 311.001 (short title) (Vernon 2002). *See* Request Letter, *supra* note 1, at 1. You indicate that a home-rule city created a reinvestment zone by ordinance in 1986, *see id.*, before the legislature repealed and codified chapter 311's statutory predecessor, former article 1066e.[2] "The ordinance provides a 22 year life for the zone. The participating taxing units include the City, the County, and the Independent School District." *Id.* at 2. You indicate that "the zone continues to serve the purposes identified in Chapter 311 of the Tax Code," *id.*, and that the city "wishes to extend the life of the . . . zone beyond 2008 if legally possible," *id.* at 1.

"Tax increment financing is designed to aid cities and towns in financing public improvements in blighted or underdeveloped areas." *City of El Paso v. El Paso Cmty. Coll. Dist.*,

---

[1]*See* Letter from Honorable James L. Keffer, Chair, Committee on Economic Development, Texas House of Representatives, to Honorable Greg Abbott, Texas Attorney General (June 10, 2004) (on file with Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter].

[2]*See* Act of May 1, 1987, 70th Leg., R.S., ch. 191, §§ 1 (adding title 3 to the Tax Code), 12 (repealing former article 1066e), 13 ("This Act is enacted pursuant to Article III, Section 43, of the Texas Constitution. This Act is intended as a recodification only, and no substantive change in the law is intended by this Act."), 1987 Tex. Gen. Laws 1410, 1411-58, 1466.

729 S.W.2d 296, 296 (Tex. 1986). Chapter 311 establishes a tax increment financing scheme in which

> the existing tax revenues of each "taxing unit" are frozen; the tax increment financing bonds are sold; the improvements are constructed; the "blighted area" is revitalized; property values soar and ad valorem tax revenues increase. The increased tax revenues over and above the tax increment base are then used to retire the tax increment financing obligations . . . .

*El Paso Cmty. Coll. Dist. v. City of El Paso*, 698 S.W.2d 248, 250 (Tex. App.–Austin 1985, writ granted), *rev'd on other grounds*, 729 S.W.2d 296 (Tex. 1986). Because tax increment financing implicates the constitutional requirement that ad valorem taxation be "equal and uniform," *see* TEX. CONST. art. VIII, § 1(a); *see generally* Tex. Att'y Gen. Op. No. MW-337 (1981),[3] the legislature drafted chapter 311's statutory predecessor, the Tax Increment Financing Act of 1981, to take effect upon the voters' approval of article VIII, section 1-g. It provides

> (a) The legislature by general law may authorize cities, towns, and other taxing units to grant exemptions or other relief from ad valorem taxes on property located in a reinvestment zone for the purpose of encouraging development or redevelopment and improvement of the property.

> (b) The legislature by general law may authorize an incorporated city or town to issue bonds or notes to finance the development or redevelopment of an unproductive, underdeveloped, or blighted area within the city or town *and to pledge for repayment of those bonds or notes increases in ad valorem tax revenues imposed on property* in the area by the city or town and other political subdivisions.

TEX. CONST. art. VIII, § 1-g (emphasis added). The adoption of article VIII, section 1-g(b) ensured the constitutionality of the Tax Increment Financing Act of 1981. *See* Tex. Att'y Gen. Op. No. JC-0152 (1999) at 3 (citing *City of El Paso*, 729 S.W.2d at 296-97).

Section 311.003(a) authorizes the governing body of a municipality by ordinance to "designate a contiguous geographic area in the jurisdiction of the municipality to be a reinvestment

---

[3]In Attorney General Opinion MW-337, this office concluded that a 1979 tax increment financing provision violated the equal and uniform requirement by "causing an unequal distribution of the ad valorem tax burden." Tex. Att'y Gen. Op. No. MW-337 (1981) at 5 ("All other property would have 100% of its value taxed to meet the ordinary needs of the city, but district property would have only a part of its value taxed for that purpose, causing an unequal distribution of the ad valorem tax burden.") (citations omitted); *see also* HOUSE STUDY GROUP, BILL ANALYSIS, Tex. S.J. Res. 8, 67th Leg., 1st C.S. (1981) (explaining the view that tax increment financing violates the equal and uniform requirement because "the earmarking of tax-increment revenue to pay for improvements within the tax-increment zone meant that property within the zone was not contributing its fair share to the city's general fund").

zone to promote development or redevelopment of the area if the governing body determines that development or redevelopment would not occur solely through private investment in the reasonably foreseeable future." TEX. TAX CODE ANN. § 311.003(a) (Vernon 2002). To be designated as a reinvestment zone, the area must meet certain statutory criteria. *See id.* § 311.005; *see also* Tex. Att'y Gen. Op. No. JC-0152 (1999) at 7 (noting that article VIII, section 1-g(b) limits tax increment financing to an area that is "unproductive, underdeveloped, or blighted" and that Tax Code section 311.005 generally comports with that constitutional requirement). Before adopting an ordinance providing for a reinvestment zone, the governing body, among other things, must prepare a preliminary reinvestment zone financing plan, which must be sent to each taxing unit that levies taxes on real property in the proposed zone, and must hold a public hearing on the creation of the zone. *See* TEX. TAX CODE ANN. § 311.003(b)-(c) (Vernon 2002). The ordinance designating an area as a reinvestment zone must, among other things, describe the boundaries of the zone, provide that the zone take effect immediately upon passage of the ordinance, and provide a date for termination of the zone. *See id.* § 311.004(a)(1), (3)-(4).

After a reinvestment zone's creation, for the zone's duration, participating taxing units that tax real property in the reinvestment zone, with certain exceptions, must pay the tax increment into the tax increment fund. *Id.* § 311.013.[4] In any particular tax year, the tax increment is calculated by subtracting "the tax increment base," which is the total appraised value of taxable real property in the reinvestment zone for the year in which the zone was designated, from the current total appraised value of taxable real property in the reinvestment zone. *See id.* § 311.012. "In general, the 'tax increments' are taxes derived by a taxing unit from the difference between the appraised value of all taxable real property located in a reinvestment zone for that year less the appraised value of the property when the zone was established. In other words, they are taxes attributable to the increased value of the real property in the zone presumably due to its development." Tex. Att'y Gen. Op. No. JC-0300 (2000) at 8 n.8 (citing Tax Code section 311.012). The tax increment fund is used to finance improvements within the zone. *See* TEX. TAX CODE ANN. § 311.014(a)-(c) (Vernon 2002).

---

[4]Whether and to what extent a particular taxing unit is required to pay the tax increment into the tax increment fund will depend upon a number of factors. *See, e.g.,* TEX. TAX CODE ANN. §§ 311.0125(d) (Vernon Supp. 2004-05) ("If a taxing unit enters into a tax abatement agreement authorized by this section, taxes that are abated under that agreement are not considered taxes to be imposed or produced by that taxing unit in calculating the amount of: (1) the tax increment of that taxing unit; or (2) that taxing unit's deposit to the tax increment fund for the reinvestment zone."), 311.013(b) ("Each taxing unit shall pay into the tax increment fund for the zone an amount equal to the tax increment produced by the unit, less the sum of: (1) property taxes produced from the tax increments that are, by contract executed before the designation of the area as a reinvestment zone, required to be paid by the unit to another political subdivision; and (2) a portion, not to exceed 15 percent, of the tax increment produced by the unit as provided by the reinvestment zone financing plan or a larger portion as provided by Subsection (f)."), 311.013(d)-(e) (certain taxing units are not required to pay a tax increment into the tax increment fund if improvements are not undertaken in the zone within three years), 311.013(f) ("A taxing unit is not required to pay into the tax increment fund any of its tax increment produced from property located in a reinvestment zone designated under Section 311.005(a) or in an area added to a reinvestment zone under Section 311.007 unless the taxing unit enters into an agreement to do so with the governing body of the municipality that created the zone. A taxing unit may enter into an agreement under this subsection at any time before or after the zone is created or enlarged. The agreement may include conditions for payment of that tax increment into the fund and must specify the portion of the tax increment to be paid into the fund and the years for which that tax increment is to be paid into the fund. The agreement and the conditions in the agreement are binding on the taxing unit, the municipality, and the board of directors of the zone.").

Section 311.017 governs a reinvestment zone's termination:

(a) A reinvestment zone terminates on the earlier of:

(1) the termination date designated in the ordinance creating the zone or an earlier termination date designated by an ordinance adopted subsequent to the ordinance creating the zone; or

(2) the date on which all project costs, tax increment bonds, and interest on those bonds have been paid in full.

(b) The tax increment pledged to the payment of bonds and interest on the bonds may be discharged and the reinvestment zone may be terminated if the municipality that created the zone deposits or causes to be deposited with a trustee or other escrow agent authorized by law funds in an amount that, together with the interest on the investment of the funds in direct obligations of the United States, will be sufficient to pay the principal of, premium, if any, and interest on all bonds issued on behalf of the reinvestment zone at maturity or at the date fixed for redemption of the bonds, and to pay any other amounts that may become due, including compensation due or to become due to the trustee or escrow agent.

*Id.* § 311.017. In addition, after all project costs and all tax increment bonds or notes issued for a reinvestment zone have been paid, and subject to any agreement with bondholders, "any money remaining in the tax increment fund shall be paid to the municipality and other taxing units levying taxes on property in the zone in proportion to the municipality's and each unit's respective share of the total amount of tax increments derived from taxable real property in the zone that were deposited in the fund during the fund's existence." *Id.* § 311.014(d).

## II.    Analysis

You inform us that no bonds or notes have been issued to fund projects for the reinvestment zone and that, as a result, "the issue is whether Section 311.017(a)(1) prohibits an extension of the termination date of the [z]one." Request Letter, *supra* note 1, at 3. As you point out, section 311.017(a)(1) expressly authorizes a municipality to adopt a subsequent ordinance providing for an earlier termination date than the date in the original ordinance designating the reinvestment zone. But neither section 311.017 nor any other provision in chapter 311 authorizes a municipality to amend the designating ordinance or to adopt a subsequent ordinance *extending* the termination date. Your letter contends that this absence of statutory authority is not dispositive because a home-rule city, which looks to the legislature only for limitation on its power, does not require such a grant of authority. *See id.* at 2-3.

"A municipality is a home-rule municipality if it operates under a municipal charter that has been adopted or amended as authorized by Article XI, Section 5, of the Texas Constitution." TEX.

LOC. GOV'T CODE ANN. § 5.004 (Vernon 1999). A home-rule municipality "has full power of local self-government." *Id.* § 51.072(a). However, article XI, section 5 provides that "no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." TEX. CONST. art. XI, § 5. Thus, while it is true that "[c]ities adopting a home rule charter have the full power of self government and look to the Legislature only for limitations on their power," *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 27 n.5 (Tex. 2003), the constitution and general laws limit their authority, *see* TEX. CONST. art. XI, § 5.

Article VIII, section 1 of the Texas Constitution requires that taxation "shall be equal and uniform." TEX. CONST. art. VIII, § 1(a). This requirement applies to home-rule cities. *See Aycock v. City of Fort Worth*, 371 S.W.2d 712, 715 (Tex. Civ. App.–Ft. Worth 1963, writ ref'd n.r.e.) ("That the taxing authority in the instant case was a City under the Home Rule Amendment would give it no greater latitude in . . . taxation or the controls regulating such in our Constitution and statutes, for as the state and county government is confined so it is likewise confined."). Article VIII, section 1-g(b) provides an exception to this requirement, permitting "[t]he legislature by *general law*" to "authorize an incorporated city or town" to pledge "increases in ad valorem tax revenues imposed on property in the area by the city or town and other political subdivisions" for the area's redevelopment. TEX. CONST. art. VIII, § 1-g(b) (emphasis added); *see* discussion *supra* pp. 2-3. Thus, in the case of tax increment financing permitted by article VIII, section 1-g(b), a home-rule city does not exercise full power of local self-government but rather must look to general law implementing section 1-g(b) for the authority to engage in tax increment financing.

In enacting implementing legislation for article VIII, section 1-g(b), the legislature has required a municipal governing body that creates a reinvestment zone to provide a date for the zone's termination in the ordinance designating the zone, *see* TEX. TAX CODE ANN. § 311.004(a)(1)(4) (Vernon 2002), and has authorized a governing body to adopt a subsequent ordinance providing for an earlier termination date, *see id.* § 311.017(a)(1). Significantly, however, the legislature has not authorized a governing body to amend the designating ordinance to change the termination date or to adopt a subsequent ordinance providing for a later termination date.

We construe chapter 311's express provisions to preclude a municipal governing body from acting to extend a reinvestment zone's duration. Tax increment financing diverts the tax increment from taxing units' general revenues to the tax increment fund, which is generally used to finance improvements only within the zone. *See id.* §§ 311.012-.014; *see also id.* § 311.010(b) (permitting use of tax increment fund revenues to pay the cost of providing affordable housing or areas of public assembly in or out of the zone). After a zone's termination, taxing units no longer pay the tax increment into the tax increment fund, and all taxes on property formerly in the zone are directed to general revenues. The legislature, in implementing article VIII, section 1-g(b), has required municipal governing bodies to establish reinvestment zones' duration at the outset and has expressly permitted zones' early termination but not their extension. This indicates that the legislature intends reinvestment zones, and tax increment financing, to exist for predefined periods and does not intend chapter 311 to authorize cities to extend them indefinitely. *See* TEX. GOV'T CODE ANN. § 311.023(1)-(2), (5) (Vernon 1998) (in construing a statute, a court may consider, among other things, the object sought to be attained, the circumstances under which the statute was enacted,

and the consequences of a particular construction). Moreover, given tax increment financing's implications for equal and uniform taxation, it is appropriate to strictly construe chapter 311. *Cf. N. Alamo Water Supply Corp. v. Willacy County Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991) ("Statutory exemptions from taxation are subject to strict construction because they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally.").

Furthermore, because the legislature has not authorized it by general law, a city ordinance or ordinance amendment extending a reinvestment zone's duration would not fall within the article VIII, section 1-g(b) exception to the general equal and uniform requirement and would therefore violate article VIII, section 1. *See* Tex. Att'y Gen. Op. No. JC-0152 (1999) at 5 ("[T]ax increment financing in an area that is not 'unproductive, underdeveloped, or blighted' within the meaning of article VIII, section 1-g(b) is not authorized by the constitution, and, moreover, would violate article VIII, section 1.") (citations omitted).

Finally, your letter also suggests that a city's authority to amend an ordinance designating a reinvestment zone in order to change the termination date is inherent in the city's authority to enact the designating ordinance, citing section 51.001 of the Local Government Code. *See* Request Letter, *supra* note 1, at 2. However, section 51.001 merely generally authorizes the governing body of any municipality, regardless of its form of government, to "adopt, publish, amend, or repeal an ordinance, rule, or police regulation" to carry out its authority. *See* TEX. LOC. GOV'T CODE ANN. § 51.001 (Vernon 1999). This statute does not authorize a city to adopt or amend an ordinance to carry out authority that the city does not have or where such an ordinance or amendment would conflict with the constitution or general law. *See, e.g., id.* revisor's note (2) ("The revised law omits as unnecessary the source law provision that ordinances . . . may not be 'contrary to the Constitution of this State.' The principle that a municipality may not adopt an unconstitutional ordinance . . . is obvious and requires no statement in a statute.").

Because such an ordinance or ordinance amendment would conflict with both the constitution and chapter 311, we conclude that a home-rule city may not act to extend a reinvestment zone's termination date beyond the date provided in the ordinance designating the zone.[5]

---

[5]As this office has concluded in the past, chapter 311 permits a municipality to create a new reinvestment zone with boundaries identical to a terminated zone. *See* Tex. Att'y Gen. Op. No. DM-390 (1996). However, the tax increment base for the new reinvestment zone would be based on the total appraised value of taxable real property in the zone for the year the new zone was designated, not the year the terminated zone was designated. *See* TEX. TAX CODE ANN. § 311.012 (Vernon 2002).

## S U M M A R Y

A home-rule city may not extend a Tax Code, chapter 311 reinvestment zone's termination date beyond the date provided in the ordinance designating the zone.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General, Opinion Committee